Argued and submitted November 30, 2006, affirmed June 13, petition for review denied November 21, 2007 (343 Or 467)

STATE OF OREGON,
*Respondent,*

*v.*

ROBERT ALLEN HENDRICKS,
*Appellant.*

04C-43613; A125444

160 P3d 1014

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Steven Powers, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Seann C. Colgan, Assistant Attorney General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

.

**ORTEGA, J.**

Defendant appeals a conviction for possession of a controlled substance within 1,000 feet of a school. ORS 475.904.[1] He assigns error to the denial of a motion to suppress evidence that was seized from him after what he asserts was an unlawful stop. We affirm.

In reviewing a trial court's decision on a motion to suppress, we are bound by the court's factual findings if there is evidence in the record to support them. *State v. Stephens*, 184 Or App 556, 560, 56 P3d 950 (2002), *rev den*, 335 Or 195 (2003). When the trial court has made no findings, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.* Legal conclusions are reviewed for errors of law. *Id.*

A Salem police officer was dispatched to a 7-Eleven store late one evening in response to a 9-1-1 call reporting that a man named Pearce was in the store, armed with a handgun, possibly on his person. Pearce was wanted by the police on a criminal charge. When the officer arrived at the store, he saw the clerk behind the counter and defendant and another man standing in the back of the store within "[h]alf an arm's reach" of each other. The two men were standing in "somewhat of a V angle[ ] towards each other" with their backs towards the door. It appeared to the officer that the two men were talking.

When the officer walked into the store, "[b]oth got wide-eyed and a surprised look on their faces" and "made an instant move * * * away from each other and walked in opposite directions." Because the officer's view of the men was partially blocked by items sitting on the store counter, he was unable to see the men's hands. The officer asked which individual was Pearce. The man with defendant identified himself as Pearce, and the officer ordered him to sit down on the floor at the front of the store.

---

[1] The parties cite ORS 475.999; however, that statute was amended and renumbered as ORS 475.904 in 2005. Or Laws 2005, ch 22, § 349; Or Laws 2005, ch 708, § 41. Those changes do not affect our decision in this case and, accordingly, we refer to the statute by its current number.

As Pearce was complying with the officer's command, defendant had moved to the center of the store and was walking down the middle aisle. The officer testified that during those few seconds he was "multi-tasking," in that he was mostly watching Pearce, but also remained aware of defendant's movements. The officer still was unable to see defendant's hands, and defendant's behavior made the officer nervous. The officer said:

"[Defendant] kept his back towards me, [and was] not looking back in my direction. He had been at the back of the store, moved to the middle of the store rather quickly and although his head was scanning, I found it odd that he was not watching me as I walked through the store and ordered somebody to sit down onto the ground. My thought at the time was most people would watch a police officer come into a convenience store and order somebody to sit down."

Within a matter of seconds, the officer ordered defendant to the front of the store to place his hands on the front counter. The officer thought that Pearce might have passed the gun to defendant, and the officer was concerned for his safety. The officer said:

"[Defendant] was together with the subject reported to have a gun at the rear of the [store]. I could not see their hands [or] what they were doing before they moved apart, and then he had his back towards me and I wanted him to keep his hands in view, [so] I instructed him to put them on top of the counter."

After defendant complied with the order, the officer began patting down defendant and asked him if he had any weapons. Defendant admitted that he had "some knives," though he claimed not to know where. The officer eventually found four knives, a digital scale, two syringes, and a small rock of methamphetamine on defendant.

On appeal, defendant contends that, when the officer ordered him to place his hands on the counter, he was unlawfully seized, or stopped,[2] in violation of Article I, section 9, of

_____

[2] An officer stops a person if the officer exercises authority over that person in a way that would lead the person reasonably to believe that he is not free to leave. *State v. Johnson*, 105 Or App 587, 590-91, 805 P2d 747 (1991). Such a stop is considered a seizure for purposes of Article I, section 9. *State v. Gerrish*, 311 Or 506,

the Oregon Constitution and the Fourth Amendment to the United States Constitution.[3] The state acknowledges that the officer stopped defendant at that moment. *See State v. Ruiz*, 196 Or App 324, 327, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005) (holding that an officer stopped the defendant when he ordered the defendant to take his hand out of his pocket). The state contends, however, that the stop was justified by officer safety concerns. We agree.

■      In *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), the Supreme Court established the framework for evaluating whether, under Article I, section 9, safety concerns justify an officer's stop:

> "Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others * * *."

304 Or at 524.[4] The state must establish that the officer subjectively believed the person posed an immediate threat of serious physical injury and that the officer's belief was objectively reasonable. *Id.*; *see also Ruiz*, 196 Or App at 327. Here, the officer testified that he feared for his safety when he told defendant to place his hands on the counter. Accordingly, the only issue before us is the objective reasonableness of the officer's concern.

■      That examination must be based on "the totality of the circumstances as they reasonably appeared to the officer[ ] at the time." *Ruiz*, 196 Or App at 327-28 (quoting *State*

---

510, 815 P2d 1244 (1991); *see also State v. Onstad*, 144 Or App 149, 152-53, 925 P2d 154 (1994).

  [3] Article I, section 9, of the Oregon Constitution provides, in part:

  "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

The Fourth Amendment to the United States Constitution provides, in part:

  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

  [4] The analysis under the Fourth Amendment is essentially the same. *See State v. Barnett*, 132 Or App 520, 525, 588 P2d 1064, *rev den*, 321 Or 137 (1995) (citing cases).

*v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004)). Intuition and generalized fear do not give rise to reasonable suspicion of an immediate threat. *State v. Cocke*, 161 Or App 179, 193, 984 P3d 321 (1999), *rev'd on other grounds*, 334 Or 1, 45 P3d 109 (2002). Rather, there must be specific and articulable facts to justify the officer's conclusion that a particular person presents an immediate threat of harm. *Id.* The inquiry into "reasonableness" requires consideration of the nature and extent of the perceived danger and the degree of intrusion resulting from the officer's conduct. *State v. Rickard*, 150 Or App 517, 526, 947 P2d 215, *rev den*, 326 Or 234 (1997).

■ However, as the Supreme Court cautioned in *Bates*, our job is not to "uncharitably second-guess" the split-second decisions of officers working under dangerous, potentially deadly, circumstances. *Bates*, 304 Or at 524. Officers frequently make life-or-death decisions in a matter of seconds, with little or no time to weigh the magnitude of a potential risk against the intrusiveness of protective measures. *Id.* Therefore, an officer must be allowed considerable latitude to take safety precautions under such circumstances. *Id.*

For example, in *Ruiz*, an officer on patrol in a park known for drug activity approached the defendant and another individual who were sitting together against a wall. 196 Or App at 326. After speaking with the individual, the officer noticed that he had a bindle of drugs in his mouth. *Id.* The officer called for backup before attempting to remove the bindle, and the defendant reached into his pocket. *Id.* The officer, afraid that the defendant might have a gun, commanded him to take his hand out of his pocket. *Id.* When the defendant removed his hand, it was covered with what turned out to be heroin. *Id.*

After concluding that the officer had stopped the defendant by commanding him to remove his hand from his pocket, this court held that the stop was justified by officer safety concerns. *Id.* at 327-29. We concluded that it was objectively reasonable for the officer to be concerned because the incident occurred in a high-crime area, and the defendant reached into his pocket during an ongoing investigation. *Id.* at 327-28. Further, the defendant was in close proximity to

the officer, and the officer's "safety concerns reasonably were heightened because [of the need] to focus [his] attention on [the] defendant's companion[, so that he was] not able to watch [the] defendant as closely * * *." *Id.* at 328 (quoting *State v. Miglavs*, 337 Or 1, 14, 90 P3d 607 (2004)).

In *State v. Barnett*, 132 Or App 520, 522, 588 P2d 1064 (1995), the defendant was a visitor to a home where the police executed a valid warrant to search for controlled substances. Before executing the warrant, police had information that the owner was paranoid, had threatened bodily harm to another person a week earlier, and possibly was armed, and that guns were readily available inside the house. *Id.* When the police entered the home, the officers swiftly moved through the residence and within a short time ordered all the occupants, including the defendant, face down on the living room floor. *Id.* The police then searched the defendant and discovered drugs in her possession. *Id.*

This court held that the seizure and search of all the occupants of the home was justified by officer safety concerns. *Id.* at 524-25. We noted that, in light of the fact that the officers had probable cause to believe that the owner of the home was armed and dangerous and that guns were readily available, "it was not unreasonable for the officers to fear that, in the confined space of the * * * living room, the putative weapons would be readily accessible to any occupant, including a visitor," and that "all occupants, including [the] defendant, might pose a threat to their safety." *Id.* at 524. The situation required the officers to act swiftly and decisively to minimize the danger presented to them and, as noted in *Bates*, when such life-or-death decisions are made in a matter of seconds, considerable latitude will be given to the officer making those decisions. *Barnett*, 132 Or App at 524. We concluded that officer safety concerns justified handcuffing the defendant even though there was no evidence, other than her presence in the home, to suggest that she was likely to use weapons against the officers. *Id.* at 524; *see also State v. Swibies*, 183 Or App 460, 466, 53 P3d 447 (2002).

Here, it was objectively reasonable for the officer to fear for his safety. First, the officer was aware of a report of a handgun, which heightened the potential danger posed by

the situation. Second, the officer's observations of the men also lends credence to his concern about defendant. The officer saw defendant within arm's length of and talking with Pearce, who reportedly possibly had a weapon, and during their exchange the officer was unable to see what they were doing with their hands. Once they saw the officer, they not only looked startled, but reacted by immediately moving away from each other. In the next moment, while the officer was attempting to secure Pearce, defendant kept moving around the store but kept his back towards, and his hands out of the view of, the officer. Finally, in addition to the degree of danger posed by the situation and the behavior of the men, the fact that the entire incident occurred over a matter of seconds further justified the officer's actions.

Defendant contends that there is nothing suspicious about two men conversing, a person looking surprised when seeing an officer, or a person looking away while an officer orders another person to sit on the ground. Indeed, if each fact is viewed in isolation, that may be true. However, when those behaviors are taken together in the context of the report of a weapon and the necessity for the officer to make a quick assessment, it was reasonable for the officer to fear for his safety.

Additionally, here, as in *Ruiz*, the companion of the person being investigated by the police (in this case, defendant) was in close proximity to the officer. 196 Or App at 328. As noted in *Ruiz*, when an officer observes suspicious behavior by a companion close by, the officer's safety concerns are legitimately heightened because of the need to focus on both the person being investigated and the companion. *Id*. As the officer in this case noted, in the seconds after entering the store, he was multi-tasking, monitoring not only Pearce but also defendant.

Likewise, as in *Barnett*, it was not unreasonable for the officer to fear, in light of the facts surrounding the interaction between defendant and Pearce, that defendant may have gained access to the reported weapon. 132 Or App at 524. Accordingly, stopping defendant even without other evidence that he was likely to use a weapon against the officer, was justified. *Id*. Moreover, as in *Barnett*, the officer had to

act swiftly and decisively to minimize the danger. *Id*. As the Supreme Court stated in *Bates*, an officer must be allowed considerable latitude to take safety precautions when presented with a potentially deadly situation that requires the officer to make a decision within a matter of seconds. 304 Or at 524-25. The officer in this case was presented with such a situation.

Affirmed.