Argued and submitted November 26, 2013, affirmed September 10, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSEPH TAYLOR RUSSELL,
*Defendant-Appellant.*

Curry County Circuit Court
11CR0006; A149887

335 P3d 337

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a judgment of conviction for felon in possession of a firearm. ORS 166.270. He assigns error to the trial court's denial of his motion to suppress evidence obtained after the car he was riding in was stopped by a police officer. Defendant contends that that evidence should be suppressed, raising two arguments. He first argues that the evidence was obtained after an unlawful extension of a traffic stop. We reject that argument without further discussion. Defendant also challenges the trial court's conclusion that the patdown search that yielded the evidence was justified by the officer-safety exception to the warrant requirement. He argues that several facts underlying the trial court's conclusion are not supported by the record. Considering only those facts that—in his view—are supported by the record, defendant contends that officer-safety concerns were not objectively reasonable. We disagree that the disputed facts are not supported by the record, and, for the reasons explained below, we affirm.

We are bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express findings of fact on a pertinent issue and there is evidence from which those facts could be decided more than one way, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.* We state the facts in light of those standards. In this case, the parties' dispute hinges on whether, before starting the patdown, a police officer had asked defendant if he had a weapon and received a response indicating that defendant had "something." We discuss in detail below the evidence related to those facts.

While on patrol with his canine, Charger, Police Officer Watson observed a gold Honda with several license plate traffic infractions. He recognized the vehicle because he knew that another police officer had arrested a then-occupant of the vehicle for possession of methamphetamine two weeks earlier. Both Watson's patrol car and the vehicle were traveling in the same direction in two separate lanes in a 25 mile-per-hour zone. The vehicle passed Watson but

then fell behind him, ultimately slowing to a "crawling" speed of between 17 and 19 miles per hour. After the vehicle turned into a gas station, Watson turned on his patrol car's emergency lights and initiated a traffic stop.

Watson's patrol car is equipped with a video recording device. Except as noted, the events described below were recorded. The video recording was admitted into evidence and played during the hearing on defendant's motion to suppress; it is also part of the record on appeal.

The area of the gas station where this encounter took place was well lighted. Watson approached the vehicle and saw three people: the driver and two passengers. Watson recognized the driver, Jones, whom he had encountered previously in the context of Watson's work as a police officer. Watson also knew that Jones was the person who had been in the vehicle and then arrested for possession of methamphetamine by another officer two weeks earlier.

Watson approached the driver's side of the vehicle and began talking to Jones. Watson discussed with Jones the possibility that traveling at such a low speed could impede traffic. Watson also pointed out the license plate violations. Watson obtained Jones's license and vehicle information, and asked Jones who his passengers were. Defendant was in the front seat on the passenger side. Watson recognized defendant from "several * * * law-enforcement related" contacts, one, several years earlier, involving theft of a van that had been burned and another involving menacing or "some sort of a dispute." The second passenger, Hellrig, was in the backseat on the driver's side. Watson also recognized Hellrig. Hellrig had been present when Watson arrested Hellrig's wife or fiancée for possession of methamphetamine. Watson did not ask for defendant's or Hellrig's identification. Watson returned to his patrol car and requested dispatch to run a records check on defendant and Hellrig.

While Watson was at his patrol car, a second officer, Murray, arrived. Murray eventually performed the patdown search of defendant. As had Watson, Murray recognized defendant. Murray had originally met defendant when he "first was released from prison" and knew about the incident involving defendant and a vehicle that had been burned. In

addition, Murray described defendant as "intimidating, considering his past [and] his size." Defendant is about 6'4" and weighs about 225 to 230 pounds. Murray is 5'10" and weighs 175 pounds. According to Murray, "I'm concerned every time I talk with [defendant]." Murray testified that the reason why he ultimately patted down defendant was his general concern that defendant is bigger than he is. While they were at his patrol car, Watson mentioned to Murray that defendant had been "in and out of prison" and was on post-prison supervision.

As he was talking to dispatch and Murray, Watson prepared Charger to do an exterior sniff of the vehicle and gave Jones's driver's license to Murray so that he could "run" it. Watson then returned to the vehicle with Charger. Watson told the occupants that he and Charger would be running the dog sniff and instructed them to keep their hands where he could see them. There is no evidence that the occupants did not comply with that instruction. When Charger sniffed the vehicle, he alerted to several places on the vehicle as having a current or residual odor of controlled substances. One of the places Charger alerted to was the front passenger side where defendant was sitting.

After returning Charger to his patrol car, Watson motioned toward defendant and said to Murray, "He is not a nice guy." Because they had probable cause to believe that there were illegal drugs in the vehicle based on Charger's alert, Watson and Murray decided to have all the occupants get out of the vehicle so that they could deploy Charger inside it.

By the time that Murray directed defendant to get out of the vehicle, four officers and four police cars were present. Murray approached the vehicle and tried, unsuccessfully, to open defendant's door; he then tapped on the window. Murray instructed defendant to get out of the vehicle. In the vehicle, defendant was talking on a cell phone and was smoking; he also was moving around in his seat, leaning his body to the right and left. Murray again tried to open the door; about 10 seconds later, defendant got out of the vehicle. About 45 seconds elapsed between when Murray first tried to open the door and when defendant got out of the vehicle.

When defendant got out of the vehicle, he had a cell phone up to his ear in his right hand and a lit cigarette in his left hand. Immediately after defendant got out of the vehicle, Murray took hold of his left wrist. Defendant and Murray spoke—although that exchange is not audible in the video recording—then Murray lifted defendant's left hand in the air, turning him around; another officer took defendant's cigarette. Murray then put both defendant's hands behind his head. By this time, Watson was standing several feet behind and to the right of defendant, and the third officer was several feet behind and to the left of defendant. Murray then began the patdown, while asking defendant, "Do you have any weapons on you?" and defendant responded, "Yeah." Continuing with the patdown, Murray asked defendant, "What do you have?" Defendant mumbled a response that is not audible on the video recording. Murray then asked defendant, "What is it?" and defendant said, "I don't know." Murray then quickly lowered defendant's hands to his waist and, with Watson's assistance, handcuffed him. Watson and the third officer proceeded to examine defendant's pants pockets. Ultimately, Watson retrieved a gun from defendant's front pants pocket.

The state charged defendant with felon in possession of a firearm, and defendant moved to suppress, arguing that evidence had been obtained in violation of his rights under Article I, section 9, of the Oregon Constitution. As pertinent, defendant contended that the patdown was a warrantless search not justified by reasonable officer-safety concerns. Defendant argued that a patdown search for officer-safety reasons must be justified by specific, articulable facts that support a reasonable suspicion of danger, and there were no such facts in this case.

The state cited the following specific facts that, it argued, supported a search based on officer-safety concerns: defendant's size, his criminal history, Watson's and Murray's previous experiences with defendant, and the positive alert for drugs in the vehicle, which Watson recognized because another officer had recently arrested its then-occupant for possession of methamphetamine. The state also argued that, as a factual matter, the patdown did not occur until after Murray had asked defendant whether he had a weapon

and defendant had indicated that he had something; accordingly, in the state's view, those facts also supported reasonable officer-safety concerns.

The trial court held that the patdown was justified in light of the following facts—"the fact that [defendant] is a large person, previous criminal contact, the [probable cause] on the drug use, and [the fact that Murray] asked [defendant] if he had a weapon [and defendant] said he had something"—and denied defendant's motion to suppress.

Defendant now appeals, challenging the denial of his motion to suppress, reprising his argument that the patdown search that revealed the firearm was not supported by reasonable officer-safety concerns. For its part, the state contends that the trial court's conclusion that the search was justified is supported by the court's explicit and implicit findings of fact.

Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Under Article I, section 9, a warrantless search or seizure is unreasonable unless it is justified by a recognized exception to the warrant requirement. *State v. Juarez-Godinez*, 326 Or 1, 8-9, 942 P2d 772 (1997); *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

In some circumstances, a search for officer-safety reasons can provide a constitutionally sufficient justification for a warrantless search. In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court explained that

"Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

Thus, under the officer-safety doctrine, the state bears the burden of proving that the officer had a reasonable suspicion, based on specific and articulable facts, that the defendant posed an immediate threat of serious physical injury. *State v. Hendricks*, 213 Or App 360, 364, 160 P3d 1014, *rev den*, 343 Or 467 (2007). Satisfying that burden requires the state to establish not only that the officer subjectively believed that the defendant posed an immediate, serious threat, but also that the officer's belief was objectively reasonable. *Id.*

To support a conclusion that an officer reasonably believed that a defendant posed an immediate threat of serious physical injury, "the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *State v. Rodriguez-Perez*, 262 Or App 206, 213, 325 P3d 39 (2014) (internal quotation marks omitted). As noted, the trial court relied on several facts particular to defendant to support its conclusion that reasonable officer safety concerns justified the patdown. Among those facts were that "[Murray] asked [defendant] if he had a weapon [and defendant] said he had something."

Defendant challenges the trial court's reliance on those facts. Defendant does not assert that there is no evidence of such an exchange, but he contends that there is no evidence that such an exchange occurred before Murray began the patdown. Defendant contends that the record—most critically the video recording of the incident—can be understood only to support a finding that that exchange occurred after the patdown began. Accordingly, in defendant's view, those facts were not among those Murray could have relied on in deciding to engage in the patdown and thus cannot be used in assessing the trial court's conclusion that the patdown was justified by reasonable officer-safety concerns. The state, on the other hand, contends that the trial court reasonably interpreted the video recording, in light of defendant's own testimony, as including two exchanges involving a similar question and response, one before the patdown began and the second during the patdown. And, the state argues that, in light of those facts—that Murray had asked defendant if he had a weapon and had received

a vague response—the trial court properly concluded that Murray's officer-safety concerns were reasonable.

The video recording reveals the following. The first exchange between Murray and defendant, just after defendant got out of the vehicle, is not audible in the video recording. Then, simultaneously with the beginning of the patdown, Murray asked defendant, "Do you have any weapons on you?" and defendant responded, "Yeah." Continuing with the patdown, Murray asked defendant, "What do you have?" Defendant mumbled a response that is not audible on the video recording. Murray then asked defendant, "What is it?" and defendant said, "I don't know."

Defendant contends that the video recording establishes that Murray did not ask defendant about weapons (and defendant did not indicate that he had something) until *after* Murray had already begun the patdown. The state, on the other hand, contends that the trial court could have understood the audible exchange to be a continuation of a conversation that had begun during the inaudible exchange. So viewed, the state asserts, the court reasonably inferred that both exchanges involved questioning about weapons (and vague responses). The state finds support for that inference in defendant's own testimony about the sequence of events:

"[DEFENSE COUNSEL]: So it was an order to get out of the car now?

"A Yeah.

"Q Okay. At the time you got out of the car, did anyone question you about weapons?

"A Yeah. They were asking me if I had weapons, and I was like, 'Well, I have, you know, have something. I don't know what it is,' because it's wrapped up in a towel and tied up with something, dropped in my lap, you know, as he walked up towards the door, and I kind of panicked and I shoved something in my cargo pants pocket, but at no point did I say I had a weapon. I said, 'I have something. I don't know what it is.'

"Q Okay. Specifically did you tell him it was in your cargo pants pocket, though?

"A   No.

"Q   Okay. Did they pat you down?

"A   Yes."

The trial court implicitly found that Murray received a vague response to questioning about weapons before he began the patdown; that implicit finding is apparent from the court's reliance on that fact in support of its ultimate conclusion that the patdown was justified. We agree with the state that that finding is supported by a reasonable inference that the inaudible exchange—which occurred before the patdown began—included questioning about weapons and a vague response, and by defendant's own testimony, which describes sequentially an order to get out of the vehicle, questioning about weapons at the time he got out of the vehicle, and, finally, the patdown. Although the inaudible and audible exchanges would be repetitive, it is well within the realm of the possible that an officer, confronted with a vague response about weapons, would repeat a question in order to try to obtain a more clear response. The trial court's finding is supported by evidence in the record and inferences that reasonably could be drawn from the record, and so we are bound by it.

Accordingly, among the facts known to Murray before the patdown began were that Murray had asked defendant if he had a weapon and defendant had responded that he had "something." The trial court did not err in relying on those facts to conclude that Murray's officer-safety concerns were reasonable.[1]

Affirmed.

---

[1] Defendant does not argue that Murray's officer-safety concerns were unreasonable if Murray knew those facts before he began the patdown. That is, defendant's only argument that Murray's officer-safety concerns were unreasonable assumes that Murray did not know those facts before the patdown started. Accordingly, we express no opinion about whether, in light of all the facts—including the question about weapons and the vague response—known to Murray at the time of the patdown, it was reasonable to believe that defendant posed an immediate threat of serious physical injury.