Argued and submitted June 30, affirmed October 22, 2003

# STATE OF OREGON,
## *Respondent,*

*v.*

# BERNIE JACKSON,
## *Appellant.*

## 9803-32587; A113982

78 P3d 584

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Kathleen Cegla, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Schuman, Judge.

EDMONDS, P. J.

---

* Deits, C. J., *vice* Kistler, J., resigned.

**EDMONDS, P. J.**

Defendant appeals from convictions for possession and delivery of a controlled substance. ORS 475.992. He assigns error to the trial court's denial of his motion to suppress evidence of crack cocaine seized by a police officer during a patdown search of his person after the car in which he was a passenger was stopped. After his motion was denied, he was convicted after a stipulated facts trial. The issue on appeal is whether the search was reasonably necessary to the officer's safety. We affirm.

■ On appeal, we take the facts as found by the trial court, so long as they are supported by the evidence. *State v. Bea*, 318 Or 220, 230, 864 P2d 854 (1993). Here, the trial court found that the events occurred as stated by the officers in their testimony. It also concluded as a matter of law that the actions of the officers were justified based on officer safety concerns. The legal consequence of the facts as found by the court is a question of law, *i.e.*, whether the search was reasonable under the circumstances, *State v. Morton*, 326 Or 466, 953 P2d 374 (1998), and it is that determination that we review here.

Shortly after midnight, two City of Portland Police Officers, Teig and Braskett, riding in a marked patrol car, saw a vehicle traveling eastbound on Killingsworth Avenue. The car was swerving in and out of its lane, and its right headlight was not working. One of the officers testified that he had observed other cars swerving in a similar matter and, after stopping them, he discovered that the occupants had been gang members. The officers turned on the patrol car's overhead lights and siren in an effort to stop the car that they had observed. However, the vehicle proceeded through a signal light that had turned red. Nonetheless, it pulled to a stop about a block later. As the officers approached the car on foot, both occupants raised their hands in a gesture of surrender. But as the officers neared the vehicle, the car sped off. The officers quickly resumed their pursuit in their patrol car and, again, the vehicle pulled abruptly over to the curb within a two block distance from where it had first stopped. During

this time, the officers had placed a spotlight on the vehicle and could observe that defendant was sitting very still.

After the car stopped a second time, the officers again approached it on foot. Officer Braskett testified that "we need[ed] to put an end to this situation to avoid any subsequent pursuits." He explained that "the fact that [defendant was] in a motor vehicle that speeds away from the police is an indication to me that there is something going on and that my safety is in question." Officer Teig testified that "[w]hen the car stopped, I had in my mind that someone could come out of the car and shoot at us." He related a specific instance where he had been in "a pursuit situation like that where a young gang member came out of the car and turned and pointed a gun at me while his buddy was running at me." The officers were also concerned about the area in which the stops had occurred. Officer Teig described the area as "a Blood gang area. Drive-bys happen there routinely. Drug trafficking is routine. High vice, high gang area."

Each officer approached the car with his weapon drawn. They commanded the occupants of the car to put their hands on the car's dashboard. They first removed the driver from the car. He was taken behind the patrol car and handcuffed. Officer Teig recognized the driver as either a gang member or gang associate. However, the officers did not recognize defendant. Meanwhile, a third officer arrived on the scene.

Officer Teig returned to the passenger's side of the vehicle with the third officer. He observed that defendant was dressed in a totally different fashion from the driver and that he "didn't appear * * * to be anything other than an ordinary person." Defendant still had on his seat belt and his hands on the dashboard when the officers approached him the second time. Teig ordered him out of the car and patted him down. As a result of the patdown, the officer felt what he believed to be drugs in defendant's left front pocket. He removed the drugs that give rise to the charges in this case and handcuffed defendant. Defendant was compliant and cooperative throughout the search.

■ Defendant's motion to suppress in the trial court sought to exclude the above evidence, in part, on the ground

that the officer conducted an unlawful search of his person in violation of his rights under Article I, section 9, of the Oregon Constitution when the officer patted him down. On appeal, defendant reasserts that argument. He contends that the officers did not have a reasonable concern for their safety that would justify the patdown search of defendant, who, in his view, was an innocent passenger in a car that had merely attempted to elude the police. The state counters that, under all of the above circumstances, Teig was entitled to pat defendant down as a reasonable safety precaution.

■    Article I, section 9, of the Oregon Constitution provides, in relevant part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

In *State v. Bates*, 304 Or 519, 524-25, 747 P2d 991 (1987), the Supreme Court explained,

> "[W]e hold that Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present.' * * * [I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether precautions taken were reasonable under the circumstances as they reasonably appeared at the time the decision was made."

(Citation omitted.)

■    To satisfy the above standard, the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety. *State v. Reinhardt*, 140 Or App 557, 562-63, 916 P2d 313 (1996), *rev*

*dismissed,* 327 Or 521, 971 P2d 408 (1998). Defendant argues that Teig identified only two factors, neither of which is specific to defendant: "(1) the fact that the driver of the car defendant was riding in had attempted to elude the police before pulling over; and (2) the fact that Teig knew the driver to be associated with a gang * * *." He concludes from that premise that Teig did not "articulate sufficient reasons for his believe [*sic*] that defendant presented an immediate threat to cause serious physical injury to the officers to justify the search on officer safety grounds."

■     The scope of the appropriate inquiry is to examine the totality of the circumstances as they reasonably appeared to the officers at the time of the patdown. Those circumstances include the following. (1) The vehicle was weaving in a manner indicative of gang behavior based on Officer Teig's past experience. (2) The driver committed several traffic violations, including going through a red light and speeding off when the officers approached. (3) The officers knew Blood gang activity, drive-by shootings, and drug trafficking were routine in the area where the stop occurred, and it was after midnight. (4) When the car first stopped, both occupants, including defendant, raised their hands in apparent surrender. The officers could reasonably believe from that conduct that defendant was acting in concert with the driver to deceive the officers as a prelude to the car speeding away after the officers had left their vehicle. (5) Officer Teig had had a prior similar gang-related experience in which he had been threatened with a gun. (6) The officers' concern that the occupants might be involved with gang-related activity was further heightened by the officers' subsequent discovery that the driver was associated with a known gang in the area.[1]

---

[1] There are also several facts that detract from a reasonable belief that defendant presented a physical danger to the officers. Defendant was compliant and cooperative when he was removed from the car. His attire and appearance raised no suspicion of gang activity. No object was observed to be tossed from the car during the time that it attempted to elude the officers, and, after the car stopped the second time, its occupants undertook no evasive actions. Moreover, defendant did not appear to be agitated or nervous when the officers contacted him personally. Those circumstances are also part of the overall circumstances that we consider in determining the reasonableness of the officers' belief. *See, e.g., State v. Miglavs,* 186 Or App 420, 429-30, 63 P3d 1202, *rev allowed,* 335 Or 479 (2003).

In a supplemental memorandum, defendant points to our holding in *State v. Faccio*, 114 Or App 112, 834 P2d 485 (1992). That case also involved the search on officer safety grounds of a passenger in a vehicle that was attempting to avoid contact with a police car by turning off on a number of side roads. The car was eventually located parked in the driveway of a house. The officer ran a records check and learned that the defendant, the registered owner of the car, had a suspended driver's license. The officer waited for assistance and, when another officer arrived, they approached the car. There were two people in the front seat, apparently trying to hide. The defendant was in the passenger's seat. One officer told the defendant that he was going to put her in handcuffs "until I get things figured out[,]" and he ordered her out of the car and handcuffed her. As she was getting out of the car, the officer saw a knife on the belt of the other occupant, Newson, which led to his arrest for being an ex-convict in possession of a prohibited weapon and the discovery of drugs and a handgun in the defendant's purse. The defendant argued to the trial court that, had she not been required to get out of the car, the officer would not have seen the knife that led to the search of the car and her purse. The trial court ruled that the officers' conduct was reasonable under the circumstances to ensure officer safety.

On appeal, we reversed. We rejected the state's argument that the furtive driving conduct, the fact that the car was parked in a darkened area, the fact that Newson was a "hard-core looking type[,]" and the fact that the defendant and her companion appeared to be trying to hide sufficed to justify a reasonable conclusion that the defendant posed an immediate threat. Rather, we found the facts in that case to be similar to the facts in *Bates*. *Faccio*, 114 Or App at 116.

In *Bates*, the court held impermissible a search based on purported officer safety grounds where the officer testified that he was concerned for his safety because the vehicle that he had stopped for "excessive vehicle emissions" at 4:40 a.m. in a "high crime residential" area had out-of-state plates, because of the way that the defendant appeared, because of the fact that there were a VCR and television set in the back seat of the car, and because the defendant did not comply with his instruction to reach down and pull an object

between his feet into plain view. The court evaluated each of the above facts and found nothing in them individually or collectively that justified a suspicion that the defendant posed an immediate threat to the officer's safety. *Bates*, 304 Or at 526. It explained,

> "The facts articulated by [the officer] in this case fall short of creating a reasonable belief that this defendant posed an immediate threat. In light of defendant's cooperative attitude, his lack of aggressive or threatening behavior and the absence of any apparent weapon, the mere possibility that he might have committed a crime and the presence of what appeared to be a bag are not sufficient."

*Id.* at 527.

We think that the circumstances in *Bates* and in *Faccio* provide a contrast to the facts in this case that shows why this is a case in which the leeway given to officers to protect themselves and others under Article I, section 9, controls. When the facts in this case are considered in their entirety, they give rise to more than an intuition or a generalized fear about officer safety that existed in *Bates* and *Faccio*. Here, the officers had specific experiences regarding gang activity in the particular area in which the stop occurred that informed their beliefs about their safety. One officer had been previously threatened with a gun under similar circumstances. In evaluating the reasonableness of the officers' beliefs, those experiences are pertinent. *See, e.g., State v. Miglavs*, 186 Or App 420, 427, 63 P3d 1202 (2003), *rev allowed*, 335 Or 479 (2003). In addition, the officers had observed particularized conduct, conduct that suggested that the car was being operated by gang members and that defendant was acting in concert with the driver. Their subsequent pursuit of the car and the responses of its occupants did nothing to belie their initial suspicion. Finally, their observation that the car was being operated in a manner that suggested gang activity was confirmed by their discovery of the identity of the driver. The facts in this case are qualitatively different than the facts in the above cases, and they lead us to conclude that the officers had a reasonable concern for their safety when they conducted a patdown of defendant.

Affirmed.