Submitted October 30, 2013, reversed and remanded August 12; on respondent's petition for reconsideration filed September 30, allowed by opinion November 18, 2015
See 275 Or App 20, 361 P3d 669 (2015)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JIMMY EDWARD DAVENPORT,
*Defendant-Appellant.*

Douglas County Circuit Court
10CR2224FE; A149453

357 P3d 514

Peter Gartlan, Chief Defender, and Andrew D. Robinson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Greg Rios, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

In this criminal case, defendant appeals the trial court's judgment convicting him of unlawful possession of methamphetamine. ORS 475.894. On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence obtained as a result of a law enforcement officer's warrantless removal of a small object from defendant's pocket. The parties dispute whether the officer's removal of the object was justified by the officer-safety exception to the warrant requirement. For the reasons explained below, we conclude that it was not, and, therefore, we reverse and remand.

We review the trial court's denial of defendant's motion to suppress for errors of law, and we are bound by the trial court's findings of fact, provided that there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Stated in accordance with that standard, the relevant facts are as follows.

Around 2:00 a.m., a law enforcement officer stopped defendant for having an obstructed registration sticker on his vehicle. The officer contacted defendant and observed that he appeared to be drug impaired. He was overly talkative, his speech was slurred, and he was grinding and biting down on his teeth; he also had dry mouth, twitchy fingers, and wide-open eyes. At the officer's request, defendant provided his driver's license. The officer returned to his patrol car, ran a records check, called for backup, and informed dispatch that he intended to administer field sobriety tests (FSTs).

The officer asked if defendant would voluntarily submit to FSTs, and defendant refused. The officer then *Mirandized* defendant and informed him that he had probable cause to arrest him for DUII, and that he should submit to FSTs "to prove * * * that he was not impaired." Defendant agreed to submit to the FSTs. The officer asked defendant if he had any weapons, and defendant answered that he had a "BB gun pistol" in the vehicle. The officer asked defendant where the BB gun was located, and defendant answered that it was "down by the gearshift[.]" Using his flashlight, the officer looked into defendant's vehicle, but did not see the

BB gun. Defendant leaned forward as if he was "trying to show" the officer the BB gun.

At that point, the officer ordered defendant to get out of the vehicle. Defendant complied. He closed the driver's side door behind him and moved about 10 feet away from the vehicle. The officer then conducted a patdown search of defendant to check for weapons and found none.

During the patdown search, the officer felt an object that was "similar in feel to a weapon cartridge" in defendant's sweatshirt pocket. The object felt "approximately three inches long" and "about the size of a small battery," which, according to the officer, was "very consistent with [the] length and diameter [of] a bullet." The object was also "round and hard[,]" which was "consistent with a cartridge and bullet." The officer asked defendant for permission to remove the object. Defendant refused. The officer then removed the object.

The officer asked defendant what the object was because he could not tell. Defendant answered that the object was a container. The officer then asked defendant what was in the container, and defendant said that he did not know, but the officer could "go ahead and look." The officer opened the object and found a couple of small "plastic bindles" that contained white residue, which tested positive for methamphetamine.

After being charged with possession of methamphetamine, defendant moved to suppress the evidence obtained as a result of the officer's removal of the object from his pocket, asserting that the removal violated Article I, section 9, of the Oregon Constitution.[1] In a memorandum in support of his motion, defendant argued, among other things, that the officer's warrantless seizure of the object from his pocket violated Article I, section 9, because the officer's suspicion that the object could be a weapon was unreasonable.

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

At the hearing on the motion, the officer testified regarding his reason for removing the object from defendant's pocket:

"What I was thinking that if for [some] unfortunate reason that me and [defendant] happened to get into a physical altercation and he did have a weapon inside that vehicle, and low and behold that that was the only cartridge for that weapon, I wanted to remove that, that cartridge and have that cartridge in my person, because like I said, [defendant] was much, much larger than me[2] and if we would have got into a physical altercation and he would have headed back towards that vehicle more likely than not I would have not been able to physically stop him.

"So ultimately what I was trying to do was remove it if it was a bullet and cartridge and secure it in my pocket."

At the conclusion of the hearing, the state argued that the officer was justified in removing the object from defendant's pocket for officer-safety purposes. In response, defendant argued that the officer "did not have reasonable grounds to search him for a weapon." In particular, defendant argued that it was not objectively reasonable for the officer to think either that the object was a bullet or that defendant would rush back to his truck to load a weapon with the object. The trial court denied defendant's motion in a letter opinion, stating that the officer's removal of the object from defendant's pocket was "within the scope of reasonable officer safety measures[.]"

On appeal, defendant renews his argument that the officer's removal of the object from his pocket violated Article I, section 9, and the parties dispute whether the officer's removal of the object from defendant's pocket was justified under the officer-safety exception to the warrant requirement.[3] In *State v. Bates*, 304 Or 519, 747 P2d 991

---

[2] The officer testified that he was 5'6" tall and weighed 255 pounds and defendant was 6'1" and weighed 300 pounds.

[3] In his brief, defendant makes several arguments regarding the officer's removal of the object and subsequent actions. In addition to arguing that the removal of the object was not justified by the officer-safety exception to the warrant requirement, he also argues that it was not justified as a search incident to arrest and that the challenged evidence would not have been inevitably discovered. The only argument that the state makes on appeal is that the officer's removal of the object was justified by the officer-safety exception.

(1987), the Supreme Court articulated the requirements that must be met in order for that exception to apply, stating that an officer may take

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*Id.* at 523-24. In order for an officer's actions to be justified under the officer-safety doctrine: "(1) the officer's actions must have occurred during a lawful encounter;[4] (2) the officer must have had a reasonable suspicion that the individual posed an immediate threat of serious physical injury; and (3) the steps the officer took to protect the officer or others must have been reasonable." *State v. Rodriguez-Perez,* 262 Or App 206, 212, 325 P3d 39 (2014).

When the state seeks to rely on the officer-safety exception to the warrant requirement to justify a warrantless search or seizure, the state must prove "that the officer

---

Defendant does not argue that, even if the officer could remove the object from his pocket, the officer's subsequent questioning was not justified by the officer-safety exception and thus unlawfully extended the stop.

[4] For the purposes of Article I, section 9, there are three types of police-citizen encounters:

> "(1) 'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9; (2) 'stops,' a type of seizure that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity; and (3) 'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime and which, under Article I, section 9, must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime."

*State v. Ashbaugh,* 349 Or 297, 308-09, 244 P3d 360 (2010). In order for a search or seizure to be justified by the officer-safety exception to the warrant requirement, the police-citizen encounter must be a stop or an arrest; the exception does not justify searches or seizures during mere conversation. *State v. Messer,* 71 Or App 506, 510, 692 P2d 713 (1984) (officer, who approached two men seated in a truck in a parking lot at 3:45 a.m. and saw a hunting knife on the seat between them, lacked the authority to order the men out of the truck and seize the knife; because the officer's encounter with the men constituted mere conversation, the officer was "without authority to compel [the men] to do anything, his only choices were to stay despite his concern or to leave ***[,] the choices that any curious passerby would have faced").

had a reasonable suspicion, based on specific and articulable facts, that the defendant posed an immediate threat of serious physical injury." *Id.* at 212-13 (citing *State v. Hendricks,* 213 Or App 360, 364, 160 P3d 1014, *rev den,* 343 Or 467 (2007)).[5] To do so, the state must prove not only that the officer subjectively believed that the defendant posed a threat, but also that the officer's belief was objectively reasonable. *Id.* at 213. In this case, defendant does not dispute that the officer had a subjective concern for his safety; he disputes whether that concern was objectively reasonable.

When determining whether an officer's safety concern was objectively reasonable, we consider "the totality of the circumstances as they reasonably appeared to the officer[] at the time * * *[.]" *State v. Jackson,* 190 Or App 194, 199, 78 P3d 584 (2003), *rev den,* 337 Or 182 (2004). To be objectively reasonable, "the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *Id.* at 198.

We recognize that police officers in the field "frequently must make life-or-death decisions in a matter of seconds" and that "it is not our function to uncharitably second-guess an officer's judgment." *Bates,* 304 Or at 524. But, although we allow officers "considerable latitude to take safety precautions in such situations[,]" *id.,* that latitude is "not *carte blanche*—there are limits to what officers can do under the justification of protecting their safety," *State v. Miears,* 166 Or App 228, 235, 999 P2d 493, *rev den,* 331 Or 192 (2000). As the Supreme Court emphasized in *State v. Rudder,* 347 Or 14, 23, 217 P3d 1064 (2009),

> "the concept of reasonableness in [the context of the officer-safety exception] is not biased in favor of the concerns of the police. Although this court is sensitive to the dangers inherent in police work and to the difficulties inherent in officer safety decisions, that does not and cannot mean that

---

[5] Recently, in *State v. Jimenez,* 357 Or 417, 353 P3d 1227 (2015), the Supreme Court articulated a test for determining when an officer may make a weapons *inquiry* for safety purposes during a stop. Because this case involves a *search* and *seizure, Jimenez* does not apply. *See id.* at 428 (noting that, in *Jimenez,* the officer did not conduct a precautionary patdown or a search, instead he asked defendant whether he had any weapons on him).

we regard those concerns as having greater weight than the constitutional right of all persons—even those who have been stopped on suspicion of criminal activity—to be free of unreasonable searches and seizures."

When an officer reasonably suspects that a stopped person poses an immediate threat of serious physical injury to the officer, a patdown search of a person's clothing "normally is sufficient to identify those objects that are relevant to officer safety concerns while leaving other information and objects relatively private." *Id.* at 24. Accordingly, an officer may not conduct a further search unless the officer develops reasonable suspicion, based on specific and articulable facts, that the person poses a serious threat of harm and that a further search would lessen or eliminate that threat. *See State v. Hoskinson*, 320 Or 83, 879 P2d 180 (1994) (citing *Bates*, 304 Or at 524) (to conduct a search of an arrestee beyond a patdown, an officer must have a reasonable suspicion, based on specific and articulable facts, that the arrestee poses a serious threat of harm). As the Supreme Court has explained, "[a] patdown, because of its limited intrusiveness, is constitutionally permissible if it is based on a reasonable suspicion of a threat to officer safety[,]" but "intrusion *into* a suspect's clothing requires something more[.]" *Rudder*, 347 Or at 25 (emphasis in original).

"The constitution requires us to adhere to the principle that an officer's reasonable suspicion that a suspect might have a weapon on the suspect's person can justify a patdown, but that something more—such as, for example, a reasonable belief that the suspect is reaching for that weapon—is required to justify a more intrusive search."

*Id.*; *see also State v. Weems*, 190 Or App 341, 347, 79 P3d 884 (2003) (officer's removal of items from defendant's pocket after patdown search was not justified by officer-safety concerns where "there was no evidence that defendant posed an immediate threat of injury to the officers present").

In order to justify a search beyond a patdown for the purpose of officer safety, an officer must have an objectively reasonable suspicion that the defendant might endanger the officer by accessing the area or the item searched. *State v. Knox*, 134 Or App 154, 159-60, 894 P2d 1185 (1995), *vac'd on other grounds*, 327 Or 97, 957 P2d 1209 (1998). An

officer-safety search cannot be based on an unlikely hypothetical possibility that a stopped person has access to, and will use, a weapon. On this point, *Knox* is illustrative.

In *Knox*, an officer saw the defendant, who was driving a truck, change lanes without signaling. The officer pulled the defendant over for the traffic violation, and the defendant got out of his truck and walked toward the officer's patrol car. The officer recognized the defendant and recalled that he had "a 'reputation' for carrying weapons" and that the last two times the officer had stopped the defendant, "he had found [him] carrying a knife and a handgun respectively." *Id.* at 156. The officer also recalled that he had received a notice from the state police that, during a traffic stop a year earlier, the defendant had been found in possession of firearms. *Id.* Concerned for his safety, the officer called for backup. While waiting for other officers to arrive, the officer asked the defendant if he had any weapons, and the defendant answered that "he had a handgun locked in his tool box." *Id.* The officer asked the defendant to lift up his shirt, and the defendant did. The officer did not see any weapons. When two other officers arrived, the officer conducted a patdown search of the defendant and did not find any weapons. But, the officer "still felt concern for his safety, because the windows of the truck were down, and he worried that defendant might have access to weapons in the interior by reaching through the window." *Id.* at 156-57. As a result, the officer searched the cab of the truck and, at the bottom of a box of clothing, found handguns and an illegal firework.

On appeal, we held that the officer's search of the defendant's truck was not justified by an objectively reasonable suspicion that the defendant, who was out of the truck and had been fully cooperative with the officers, posed an immediate threat of serious physical injury to the officers. *Id.* at 159-60. We noted that the trial court had found that the defendant had "never before exhibited any violence towards the police or made threats to them" and that the defendant "was not acting in any unusually angry or strange manner that would give the officer any immediate concern[,]" and we further noted that "[t]hose findings are supported by the record." *Id.* at 159. We held that the defendant's reputation

for carrying weapons, by itself, was "insufficient to create a reasonable suspicion that defendant might use them during the otherwise routine traffic stop." *Id.* at 159-60. In doing so, we rejected the state's argument that "the likelihood that defendant had guns readily accessible to him * * * gave the officer reason to secure those guns[,]" observing that the state had failed "to explain how defendant's mere access to weapons gives rise to a reasonable suspicion that defendant posed an *immediate* threat of using them." *Id.* at 160 (emphasis in original). Accordingly, we concluded that the officer "had no basis for searching defendant's truck." *Id.*; *see also State v. Walker*, 181 Or App 548, 552-53, 47 P3d 65 (2002) (search of defendant's jacket during a stop was not justified by officer-safety concerns where there was no evidence that "defendant had a weapon, much less that he was likely to use it, or that in any other way defendant posed a threat to [the officer] or anyone else"); *State v. Bridgeman*, 173 Or App 37, 45, 23 P3d 370, (2001) (officer's search of the car in which the defendant had been a passenger was not justified by the officer-safety exception where "[t]he only 'threat' * * * was abstract speculation that an apparently 'fully cooperative' citizen, who was handcuffed and was standing several feet from a car, *might* somehow lunge into the car where a weapon *might* have been hidden" (emphases in original)); *State v. Dyer*, 157 Or App 326, 332-33, 970 P2d 249 (1998) (where the defendant was seated on a curb away from his car, had cooperated with the officer, and had not said or done anything threatening, the officer was not justified in searching the defendant's car, even though the defendant was carrying a knife and had a prior conviction for possession of a weapon).

In this case, the officer who stopped defendant conducted a patdown search, which, as mentioned, "normally is sufficient to identify those objects that are relevant to officer safety concerns while leaving other information and objects relatively private." *Rudder*, 347 Or at 24. Therefore, the officer could not remove any objects from defendant's pockets unless he had a reasonable suspicion, based on specific and articulable facts, that defendant posed a serious threat of harm and that removal of the object from his pocket would lessen or eliminate that threat.

The officer was concerned that, if the object was a bullet and defendant's BB gun was an actual gun, defendant might attack him, return to his truck, and put the bullet in the gun. That concern is similar to the officer's concern in *Knox*—that the defendant would reach through the window of his truck and access a weapon—which we held was too speculative to support a search beyond a patdown, especially in light of the fact that the defendant was not acting in a violent or threatening manner and had no history of doing so.

As defendant points out, in this case, the officer's reason for seizing the object

"depended upon a string of stacked inferences that were each individually implausible even considered in isolation: a fight might break out (even though defendant showed no signs of hostility); the BB gun pistol was actually a real gun; the object in defendant's pocket was ammunition for the gun; defendant would decide to access the gun and load it with that ammunition and shoot [the officer]."

Although the officer may have believed that that chain of events was possible, the officer's subjective belief was not objectively reasonable, given the totality of the circumstances of the stop. The speculative scenario that the officer described to justify his removal of the suspected bullet cartridge is more akin to "intuition or a generalized fear" than a reasonable suspicion supported by specific and articulable facts. *See Jackson*, 190 Or App at 198 (stating that mere "intuition or a generalized fear that the person may pose a threat to the officer's safety" is insufficient).

To recount, the officer stopped defendant for a traffic violation and developed a suspicion that defendant was drug impaired. At the officer's request, defendant provided his driver's license, which the officer used to run a records check. There is no evidence in the record that the records check revealed that defendant had any warrants or a criminal record. When the officer returned to defendant's vehicle and asked defendant if he had any weapons, defendant said that he had a BB gun and told the officer where it was. The BB gun was not readily visible to the officer when he looked into defendant's vehicle, so defendant attempted to show the officer where it was. The officer directed defendant to get out

of the car, and defendant did, closing the door behind him and moving approximately 10 feet away. Defendant submitted to a patdown search, during which no weapons were found.

In sum, defendant was unarmed and had not engaged in any aggressive, threatening, or furtive conduct, and there is no evidence that he had a history of any such conduct. He provided the officer with his identification, answered the officer's questions, and complied with the officer's commands. He was outside of his vehicle at the time of the patdown, and there is no evidence that he had made any movements to return to it. Under the totality of circumstances, the possibility that defendant would use the object in his pocket to cause the officer serious physical injury was too remote to support the search of the pocket and seizure of the object. Therefore, the search and seizure violated Article I, section 9.

Because the search and seizure violated Article I, section 9, the question becomes whether the evidence resulting from the search and seizure was inadmissible. Defendant argues that all of the evidence he sought to suppress—including his statement that the object was a container, which prompted the officer to ask if he could open the object, and the results of his subsequent consent to the opening of the object—should have been suppressed because it derived from the unlawful removal of the object from his pocket.[6] *See State v. Musser*, 356 Or 148, 157, 335 P3d 814 (2014) ("[E]xploitation of police misconduct may exist if the police seek the defendant's consent solely as a result of knowledge of inculpatory evidence obtained from their unlawful conduct.").

---

[6] Defendant argues that his consent was the product of police exploitation of the illegal search of his pocket. He asserts that the officer "asked about the container only because it came to light when he unlawfully removed it from defendant's pocket" and analogizes the facts of this case to those in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), *overruled in part by State v. Hall*, 339 Or 7, 115 P3d 908 (2005), where, "the officers would never have asked the defendant for permission to search the car, had it not been that their attention was directed to him and the car by the result of the earlier, illegal search. A more direct exploitation of illegal government activity would be difficult to posit." *State v. Weaver*, 319 Or 212, 224, 874 P2d 1322 (1994) (Gillette, J., concurring) (describing the facts of *Quinn*).

When, as here, an officer obtains a person's consent to a search after an illegal stop or an illegal search, the state bears the burden of proving that the "(1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search." *State v. Unger*, 356 Or 59, 75, 333 P3d 1009 (2014). The state has not argued that defendant's consent was not the product of police exploitation of the illegal search and seizure.[7] Consequently, we conclude that the trial court erred in denying defendant's motion to suppress. *See State v. Kimmons*, 271 Or App 592, 602, 352 P3d 68 (2015) (trial court erred in denying defendant's motion to suppress where the state "offer[ed] no reasoned explanation" to support its assertion on appeal that the evidence was not the product of police exploitation of illegal conduct).

Reversed and remanded.

---

[7] In its brief, the state responds to defendant's claim that his consent was invalid because it derived from the officer's unlawful removal of the object from defendant's pocket by asserting only that "[t]hat claim fails because * * * there was no prior illegality. [The officer's] removal of the container was authorized under officer-safety principles. Defendant's consent was thus valid."