Submitted June 29, 2015, reversed and remanded August 3, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES DAVID MUSALF,
*Defendant-Appellant.*

Curry County Circuit Court
12CR1006; A154499

380 P3d 1087

Jesse C. Margolis, Judge.

Peter Gartlan, Chief Defender, and Elizabeth Daily, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Judge, and Wilson, Senior Judge.

## WILSON, S. J.

Defendant appeals a judgment convicting him of unlawful possession of a Schedule I controlled substance, ORS 475.752(3)(b). He assigns error to the trial court's denial of his motion to suppress evidence. Specifically, defendant contends that the warrantless search of the inside of his pocket, which yielded a plastic container holding the drugs, was neither consensual nor justified by the officer safety exception to the warrant requirement and, thus, violated his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. We agree that the search of the interior of defendant's pocket exceeded the scope of his consent to a patdown and was not supported by a reasonable suspicion, based on specific and articulable facts, that defendant might pose a serious threat of harm to the officer or others present, thereby violating his rights under Article I, section 9. Accordingly, we reverse and remand.

## I.   FACTS

We state the facts consistent with the trial court's explicit and implicit factual findings, which the record supports. *State v. Culley*, 198 Or App 366, 374, 108 P3d 1179 (2005). On the morning of December 7, 2012, someone called the Curry County Sheriff's Office with a complaint that several people in an older red car with a loud exhaust were stealing gasoline near Nesika Beach. The caller did not give a make, model, year, or license plate number for the car. However, no deputies were available to investigate the complaint. More than two hours later, Patrol Lieutenant Ward was pulled off to the side of the road about 20 miles from Nesika Beach when he saw and heard an older red car with a loud exhaust approach on Highway 101. As the car passed, Ward could see the driver and recognized him as Klamroth. Ward had arrested or cited Klamroth several times for driving while suspended and knew that he did not have a valid driver's license. Ward also knew that Klamroth was "involved in the drug world, the activities of drugs and hanging around people who are known drug users." By drugs, Ward meant methamphetamine and marijuana.

Ward immediately began following the red car, which appeared to be speeding up as he was gaining on it. When he was about to catch up to the car, Ward noted that its speed was 66 miles per hour. As Ward was about to turn on his overhead lights to pull Klamroth over, Klamroth "whipped into an overlook * * * at an unsafe speed." Ward turned on his overhead lights and pulled in behind the red car. Klamroth stepped out of the car like he was going to run, and Ward yelled at him to stay with the car. Ward stated that he was concerned for his safety when it appeared that Klamroth was going to run because, based on his training and experience, when someone is ready to run they may be dangerous or have weapons.

Ward contacted Klamroth and observed that his speech was slurred, he could not stand still, he was twitching, and he had "all the characteristics of being under the influence of a controlled substance." Oregon State Police Trooper Rushton arrived at the scene 10 minutes after the stop and began investigating Klamroth for driving under the influence. Rushton ultimately arrested Klamroth for that offense. Detective Gardiner also arrived at the scene to assist Ward.

There were three passengers in the red car, including defendant. Ward learned that none of them had a valid driver's license. He recognized the front seat passenger as M. Musalf,[1] someone he had dealt with a month or two before. Although Ward did not testify that he recognized defendant or knew of prior specific law enforcement interactions with him, he testified that his deputies had "dealt with the Musalf family with drugs, known drug users." Again, Ward specified that, by "drugs," he meant methamphetamine. Defendant was in the backseat with Chappelle, whom Ward also recognized as a known drug user. The presence of four known drug users in the car caused Ward concern because "[t]here's probably some drugs in the vehicle, and drug users usually have—you know, known drug users possibly carry weapons." Ward also testified that, based on his training and experience, when the drug of choice is methamphetamine,

---

[1] M. Musalf is defendant's daughter, and we refer to her as M. Musalf in this opinion to avoid confusion with defendant, who has the same last name.

the user is more of a security risk because of the behavioral changes caused by that drug.

Detective Gardiner contacted the probation department and detained M. Musalf for a probation violation at the department's request. He put her in his vehicle. Meanwhile, Ward was standing outside the rear door of the red car and saw defendant and Chappelle in the backseat "doing some movements, like they were trying to stash something, get rid of something." He was concerned—stating, "a little bit of hair goes up on the back of your neck"—and explained that he wondered, "Do they have weapons, or are they trying to stash some drugs, or what?" Their heads were down and their arms were moving. Ward also saw a white powder smeared on the seat and floorboards, as though it had been rubbed around by feet. It "crossed [Ward's] mind that it's possibly methamphetamine."

After Gardiner arrested M. Musalf, he made contact with Chappelle, asked him to step out of the car, and patted him down for weapons. Gardiner eventually cited Chappelle for unlawful possession of prescription drugs and released him on foot.

Meanwhile, Ward asked defendant to get out of the car. He "wanted to make sure, you know, they weren't going to stash any more, destroy any more drugs, if that was actually drugs in the car that we saw." Ward also testified that he had reasonable suspicion that the powder he saw was a controlled substance and that he had reasonable suspicion to investigate defendant for possession of drugs. However, the testimony about the conversation between the officers and defendant after defendant stepped out of the car is ambiguous. Ward testified:

> "Trooper Rushton contacted him and asked if he could, you know, search his person. He gave permission, and then there was a little banter back and forth about yea and nay, and—but he was searched and we found what we believed was methamphetamine on him."

He also testified, "What I remember him saying was that 'Yeah, you can search me. I'm not under arrest.'" At another

point during the hearing on the motion to suppress, Ward testified:

"I'm not exactly—I don't recall exactly what the conversation was. I—I do recall him saying, 'Yeah, you can search. I'm not under arrest,' and then I think he said something about, 'Oh, why should I let you search me?'

"And then—And then Trooper Rushton says, 'We're going to search you because of our safety.'"

On cross-examination, Ward read from his report:

"We asked [defendant] if we could search his person. At first he declined, and when * * * we told [him] that we saw him messing around with something in the backseat, he consented to the search, to the pat-down."

When defense counsel asked again if defendant had declined consent to search, Ward responded:

"Like I said, I don't know exactly how he said it. * * * I can only testify on what my report says because I don't recall exactly what the conversation was. I didn't review the video, I don't have video or audio on me, but I do recall him saying that, 'I don't mind being patted down.' Basically, 'I'm not under arrest.' He did somehow decline at first, but after that, he said he would—he could be patted down."

Rushton testified that Ward was already talking to defendant when he walked up. Ward was confronting defendant about his movements in the backseat and told defendant that he was probably hiding something. Rushton testified that Ward said, "'You wouldn't mind me searching you?'", but stated "I don't remember what [defendant] said." Rushton further testified:

"And then I said—I explained who I was, that I was recording, and asked him if he had any weapons or any knives or weapons of any kind, and that would he mind if I patted him down. He said something to the effect of, 'I don't mind if you pat me down. I'm not under arrest.'"

Rushton also testified from his report that Ward asked defendant "if he would be patted down for weapons or drugs," and that "[i]nitially [defendant] declined, but allowed Lieutenant Ward to pat him down."

In addition to the testimony of Ward and Rushton, the trial court received into evidence during the hearing on the motion to suppress the recording made of the stop by Rushton's in-vehicle recorder. As pertinent to the issue on appeal, the video recording shows Ward talking to defendant while defendant is still inside the car. The video shows Ward escorting defendant out of the car. Approximately 30 seconds later, Rushton approaches defendant and Ward. Notably, because Rushton was the only person wearing a microphone, the conversation between defendant and the officers cannot be heard on the recording until that time. Ward is first heard telling defendant about the movements he observed when defendant was in the backseat:

"Ward:   * * * and you were fidgeting back here.

"Defendant:   Yeah, with my wallet.

"Ward:   No, I think you were fidgeting with something else.

"Defendant:   Like what?

"Ward:   I don't know, maybe you were putting something in your pockets?

"Defendant:   No.

"Ward:   Okay, then you don't have a problem with me searching your pockets."

Defendant laughed, but gave no other audible response. After a brief discussion of where defendant was sitting, Rushton spoke to defendant. Although Ward testified that Rushton said, "'We are going to search you because of our safety,'" the video recording from the scene shows something more nuanced:

"Rushton:   I'm Trooper Rushton with the state police. I'm recording. You don't have any knives, weapons on you at all? You mind if we just take a quick look, pat you down?

"Defendant:   You can pat me down, but * * * [inaudible] * * * I don't care.

"Rushton:   You don't care?

"Defendant:   Well, I do care, but I'm not under arrest."

Defendant then held out his arms, and Ward conducted the patdown. Ward testified that the patdown "was a search at that time for weapons." Ward stated that he felt a "hard object" in one of defendant's pants pockets, but did not describe the dimensions of the object that he felt. Rushton testified that he wrote in his report that it was "a small plastic container." A photograph of the container was received in evidence at the hearing on the motion to suppress. The photograph shows a clear round container. There is no scale in the picture, but there is what appears to be a gloved finger. The container is slightly smaller than two widths of that finger.

Ward testified that, at the time of the patdown, he could not tell what the hard object was.

"Prosecutor:   When you felt the hard item in the pocket, could you tell what it was prior to removing it?

"Ward:   No. It was just a hard object.

"Prosecutor:   Did that, the fact that it was a hard object, give you safety concerns?

"Ward:   I didn't know what it was, and it could have been a weapon."

Upon feeling the hard object in defendant's pocket during the patdown, Ward removed the object from defendant's pocket and saw that it was a transparent plastic container holding a crystal powder substance that, from his training and experience, "looked exactly like methamphetamine." The officers then arrested defendant. The arrest was approximately one half hour after the initial stop of the car. At no point during the encounter did the officers make threats or promises in order to gain defendant's consent to search. Nor did the officers point their weapons at defendant or otherwise threaten him.

Rushton informed defendant of his *Miranda* rights, and defendant confirmed that the substance was methamphetamine. He said that it belonged to M. Musalf, who had given it to him during the initial stop. Defendant also stated that he had been using methamphetamine for about six months.

The state charged defendant with unlawful possession of a Schedule I controlled substance, ORS 475.752(3)(b). Defendant filed a motion to suppress evidence derived from the warrantless search of his pocket, asserting that the search violated his rights under Article I, section 9, and the Fourth Amendment. In part, defendant argued that he did not voluntarily consent to the search and that the search was not justified by officer safety concerns. At the hearing on the motion to suppress, Rushton explained his concerns for officer safety in the encounter with defendant:

"Prosecutor:   All right. And you had an officer safety concern?

"Rushton:   That is correct.

"Prosecutor:   And why is that?

"Rushton:   Because of the people that he's associating with, because of the possible involvement in an earlier theft, and because of—two people were arrested out of that vehicle.

"Prosecutor:   All right. And does the fact that methamphetamine was involved in this stop, did that give you any extra officer safety concerns or not?

"Rushton:   It does.

"Prosecutor:   And why is that?

"Rushton:   Because based on my training and experience, anyone who's on methamphetamine can go up and down very quickly. Their behaviors are erratic.

"Prosecutor:   Okay.

"Rushton:   And they can—They can become very violent very quick."

The state argued that the warrantless search of defendant's pocket was justified both by defendant's voluntary consent and by officer safety concerns. In his rebuttal argument, the prosecutor set out the state's position:

"Prosecutor:   I think the important thing to look at here is that the defendant wasn't personally stopped or seized, that there were not compelling circumstances, that he was

not under arrest, that it was not a custodial situation, that the police were interested in investigating the—interested in talking to him, they had reasonable suspicion, and that the defendant then consented to a search, but they also have officer safety concerns as well.

"But what we have is a consensual search in a car that had known criminals, methamphetamine—or what appeared to be methamphetamine powder smeared into the seat, in the floor of the car. The fact it turned out later not to be methamphetamine, it still went to the officer's reasonable suspicion, and that since there was no compelling circumstances, no actual seizure, and the defendant's consent to the search, the—the search is lawful. That's all."

The trial court denied the motion to suppress, adopting the state's arguments:

"The Court: You put it in a nutshell, [prosecutor], and I agree with what you just said in your rebuttal. To keep it short, I don't think I need to repeat it. I think that there was reasonable suspicion. I believe that with all the evidence that was there, the what appeared to be a white, powdery substance, the furtive movements by defendant, it was individualized after the defendant was making those furtive movements in the back, and then he got out of the car, and he consented to the search. The officers found the methamphetamine, then arrested him, gave him Miranda, and then he made further statements.

"The motion to suppress is denied. And I'm incorporating all of the argument that [prosecutor] made in my finding—in my ruling."

After the court denied defendant's suppression motion, the parties tried the case to the court. The trial court convicted defendant of unlawful possession of a Schedule I controlled substance, in violation of ORS 475.752(3)(b).

## II.  STANDARD OF REVIEW

"In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *State v. Holdorf,* 355 Or 812, 814, 333 P3d 982 (2014). If the trial court did not make express findings of fact on all pertinent issues, and there is evidence from which those facts could be decided in

more than one way, we presume that the trial court decided those facts in a manner consistent with its ultimate conclusion. *Id.* On appeal, "our role is to decide whether the trial court correctly applied the law to those historical facts." *Id.*

## III. ANALYSIS

On appeal, defendant asserts that the trial court erred when it denied his motion to suppress evidence, because the search of the interior of his pocket violated both Article I, section 9, and the Fourth Amendment. Adhering to the requisite "first things first" construct, *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983), we begin with defendant's argument under Article I, section 9, which provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Warrantless searches "are [p]er se unreasonable subject to a few specifically established and well-delineated exceptions," including voluntary consent to the search and officer safety. *State v. Taggart*, 7 Or App 479, 481, 491 P2d 1187 (1971) (internal quotations omitted). The state bears the burden of proving that such an exception to the warrant requirement exists. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

Defendant argues that the trial court's ruling on the motion to suppress was in error in three respects: (1) "The evidence was insufficient to support the court's factual finding that defendant consented to a search as opposed to a patdown"; (2) "The facts adduced did not establish, as a matter of law, that defendant's consent—whether a patdown or search—was voluntary"; and (3) "The state failed to prove that the officer-safety exception justified the search of the interior of defendant's pockets." Moreover, defendant contends that the "[f]ailure to suppress the unconstitutionally obtained evidence was not harmless error." We address each argument in turn, but discuss defendant's first two contentions in reverse order because, if the expressed consent was not voluntary, its scope does not matter.

A. *Voluntariness of Consent*

Generally, voluntary consent is a recognized exception to the warrant requirement and, therefore, police may

conduct a warrantless search if "someone having the author-ity to do so voluntarily gave the police consent[.]" *State v. Paulson*, 313 Or 346, 352, 833 P2d 1278 (1992). "The test for voluntariness is whether, under the totality of the circum-stances, the consent was given by an act of a defendant's free will, as opposed to resulting from express or implied coercion." *State v. Jepson*, 254 Or App 290, 294, 292 P3d 660 (2012). Again, although we are bound by the trial court's explicit and implicit findings of historical fact if they are supported by evidence, "[w]hether those facts establish that the consent was voluntary * * * is a legal issue that we review independently." *Id.*

Here, the trial court made no specific factual find-ings, either of its own or in adopting the prosecutor's argu-ment, about what the officers said to defendant, or what defendant said to the officers, concerning searching him or patting him down. Indeed, the court simply concluded that "[defendant] consented to the search." Nonetheless, viewed consistently with our standard of review, the facts establish that defendant's consent was voluntary.

Moreover, we conclude that the trial court's implicit findings are supported by evidence in the record. Both Ward and Rushton testified that, when Ward first asked defen-dant if he would consent to be searched, he declined. When Rushton then asked, "You mind if we just take a quick look, pat you down," defendant answered, "You can pat me down, but * * * [inaudible] * * * I don't care." When Ruston echoed, "You don't care," defendant responded, "Well, I do care, but I'm not under arrest." Additionally, although there were three law enforcement officers on the scene and two other occupants of the red car had been taken into custody, there was no evidence of the officers drawing their guns or using force on anyone, including defendant. There was no evidence of threats or any other kind of coercion that would make defendant's consent involuntary.

Nonetheless, defendant maintains that, without proving the exact words exchanged, the state cannot estab-lish the voluntariness of a defendant's consent. To be sure, our case law makes clear that the state must establish with some precision how the law enforcement officers make a

request of a defendant for the court to determine whether alleged consent was actually and voluntarily given. *See, e.g., State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978) ("[A]ppellate courts must know what the state's witnesses contend was actually said, in order for appellate courts to discharge their constitutional function in determining the validity of consent."); *State v. Lowe*, 144 Or App 313, 318, 926 P2d 332 (1996) (same). And, indeed, the record here is quite detailed about what Ward and Rushton said to defendant when seeking his consent. The trial court had the benefit not only of the officers' present recollections and their testimony about what they had written in their reports, but it also had an actual recording of most of the conversation in which the officers sought consent. The recording does not capture Ward's conversation with defendant before Rushton approached, but the state does not contend that defendant's consent occurred during that exchange. To the contrary, the evidence is that defendant declined consent to a search at that time. Further, any ambiguity in the one inaudible part of the recording in the middle of defendant's consent—"[y]ou can pat me down, but [inaudible] I don't care"—was immediately clarified in the exchange with Rushton.

We, therefore, conclude that the facts establish that defendant's consent was voluntary, and we reject defendant's argument contending otherwise.

## B. *Scope of Consent*

Next, defendant argues that Ward exceeded the scope of defendant's consent, because the most he consented to was a patdown, that is, an examination of the exterior of his clothing for weapons, not an intrusion into the interior of his pockets. We agree.

The standard for determining the scope of a person's consent under Oregon law is one of objective reasonableness. *State v. Jacobsen*, 142 Or App 341, 349, 922 P2d 677 (1996). "[U]nder that standard, we must determine whether an objectively reasonable person would have understood the particular consent given to include a search of the area at issue." *Id.* Significantly, "an important factor in determining the scope of a consent to search is the contents of the

interchange between the officer and the defendant." *Id.* at 348.

Here, the trial court found that defendant had consented to "the search," without further explanation. However, we emphasize that there is a distinction of constitutional dimension between a patdown and a search that involves entering pockets. As the Oregon Supreme Court explained in *State v. Rudder*, 347 Or 14, 217 P3d 1064 (2009), opening and inspecting the contents of a person's pocket is "a form of search that is more intrusive than a patdown and that normally only occurs incident to a lawful arrest, when police are authorized to search the arrestee's person and effects for evidence of the crime for which the arrest was made." *Id.* at 25; *see also State v. Miglavs*, 337 Or 1, 3 n 1, 90 P3d 607 (2004) (stating that "the term 'patdown' is intended to mean 'an external patting of a person's outer clothing'"). Therefore, the question before us is whether, based on the findings and record before the trial court, an objectively reasonable person could have understood defendant's consent to include the interior of his pockets, rather than a mere patdown.

We conclude that the record before us supports only a finding that defendant consented to a limited "patdown" search. It does not support a finding that it was objectively reasonable for Ward to believe that defendant consented to Ward's entry into his pocket. When Ward first asked defendant if he could search his pockets, defendant declined. Moreover, when he ultimately gave consent, both Ward and Rushton testified that he consented to being "patted down." Although both officers used the word "search" in describing what defendant consented to in general terms, as they elaborated and became more specific in their testimony, they both said that defendant consented to being patted down. Indeed, the video recording leaves no doubt:

"Rushton: *** You mind if we just take a quick look, pat you down?

"Defendant: You can pat me down, but *** [inaudible] *** I don't care.

"Rushton:   You don't care?

"Defendant:   Well, I do care, but I'm not under arrest."

Defendant's own distinction between the patdown he was consenting to and the search to which he would be subject if he were under arrest confirms the limited scope of his consent. As the court noted in *Rudder*, "[T]he difference between those two kinds of searches, and the circumstances that justify them, are so widely recognized in the law of this state and in federal law that a police officer reasonably can be expected to recognize the distinctions involved." 347 Or at 25.

Because the record does not support a finding by the trial court that an objectively reasonable person could have understood defendant's consent to include the interior of his pockets, the officers exceeded his voluntary consent when they searched the interior of his pocket. As a result, unless the officers' actions can be justified by some other exception to the warrant requirement, we agree with defendant that the trial court erred when it denied the motion to suppress the evidence found inside his pocket on the basis that defendant consented to the search.

C.   *Search Based on Officer Safety Concerns*

Before the trial court and again on appeal, the state alternatively justifies Ward's entry into defendant's pocket on officer safety grounds. The trial court agreed with the state's premise and incorporated the state's reasoning in its ruling on defendant's motion to suppress. On appeal, defendant contends that the evidence in the record does not establish that the intrusion into defendant's pocket was justified by a concern for officer safety. For the reasons that follow, we agree with defendant.

Generally, officer safety is another recognized exception to the Article I, section 9, warrant requirement. *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). Although "[w]e hesitate to second-guess the perception of threat by an experienced police officer[,] * * * [w]e review the sufficiency of the asserted officer safety rationale under the standards set out in *Bates*." *State v. Amell*, 230 Or App 336, 340, 215 P3d 910

(2009). Specifically, the officer-safety exception permits an officer to

> "take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*Id.* (quoting *Bates*, 304 Or at 524).

As we recently explained in *State v. Davenport*, 272 Or App 725, 731, 357 P3d 514 (2015), a patdown search is usually sufficient to quell fear of an immediate threat, "while leaving other information and objects relatively private." Consequently, "an officer may not conduct a further search unless the officer develops reasonable suspicion, based on specific and articulable facts, that the person poses a serious threat of harm and that a further search would lessen or eliminate that threat." *Id.* To be objectively reasonable, "the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *State v. Jackson*, 190 Or App 194, 198, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004). Notably, an officer may remove an item felt during a patdown only if he or she reasonably suspects that it presents an officer safety concern. *State v. Blevins*, 142 Or App 237, 244, 920 P2d 1131 (1996), *rev den*, 327 Or 521 (1998); *but see State v. Weems*, 190 Or App 341, 347, 79 P3d 884 (2003) (officer's removal of items from defendant's pocket after patdown search was not justified by officer-safety concerns where "there was no evidence that defendant posed an immediate threat of injury to the officers present").

We note at the outset that the patdown was authorized by defendant's consent. As discussed above, a patdown is "an external patting of a person's outer clothing." *Miglavs*, 337 Or at 3. Therefore, we must resolve whether an officer safety concern justified the additional intrusion into defendant's pocket, an intrusion that we have already concluded was outside the scope of the patdown. Thus, the issue on

appeal is whether Ward's safety concern was objectively reasonable *at the time of Ward's intrusion into defendant's pocket.* "Accordingly, we must determine whether there was sufficient evidence about defendant's demeanor, conduct, or status that suggested that defendant posed an *immediate threat of serious injury* to [Ward]." *State v. Smith*, 277 Or App 298, 303, 373 P3d 1089 (2016) (emphasis added).

Notably, in this area of search and seizure law, fact matching has its limitations, and whether a gesture or movement will give rise to a reasonable suspicion that a citizen poses an immediate threat of serious physical injury depends on the individual circumstances of each case. *State v. Hannaford*, 178 Or App 451, 458, 37 P3d 200 (2001). Here, the following were the "specific and articulable facts" found by the trial court to be known by Ward at the time of his intrusion into defendant's pocket: (1) when Ward first encountered defendant, he suspected that defendant was involved in a crime based on the reports of gasoline theft; (2) defendant was observed making furtive movements in the backseat of the red car; (3) white powder, consistent with the look of methamphetamine, was seen in the backseat of the red car in the vicinity of where defendant made those furtive movements; (4) defendant was in the company of three known drug users, one of whom appeared to be under the influence of intoxicants and who appeared ready to run at the beginning of the stop; and (5) Ward had completed a patdown of defendant, to which defendant had voluntarily consented, revealing a "hard object" in defendant's pocket. Additionally, Ward testified that, based on his training and experience, "drug users possibly carry weapons" and methamphetamine users are an even greater risk than other drug users because of their "erratic" behavior.

It bears repeating that the question here is whether, at the time Ward intruded into defendant's pocket, his concern was "'based on facts specific to [defendant], not on intuition or a generalized fear that [defendant might] pose a threat to [Ward's] safety.'" *Smith*, 277 Or App at 303 (quoting *Rodriguez-Perez*, 262 Or App at 213). Thus, despite the state's primary reliance on defendant's furtive movements, his presence in the company of known drug users, and

Ward's training and experience pertaining to both drug users in general and methamphetamine users specifically, the record here is devoid of specific and articulable facts that defendant posed a *serious and immediate threat of physical harm*. Defendant was never combative with the officers or uncooperative in any way. Although he declined Ward's first request for consent to search, he did so with a laugh. When he gave consent to the patdown, he raised his arms. There was no evidence that he attempted to flee or reach for or attempt to protect his pocket once the patdown was underway.

Although Ward observed defendant making furtive movements in the backseat of the red car, saw white powder smeared on the seats and floorboard, and testified that he wondered, "Do they have weapons, or are they trying to stash some drugs, or what," he also testified that he asked defendant to step out of the car because "I wanted to make sure, you know, they weren't going to stash any more, destroy any more drugs, if that was actually drugs that was in the car that we saw." Significantly, he did not state that he was afraid of defendant accessing a weapon or that he asked defendant to get out of the car because defendant posed an immediate threat of harm. Further, between the time defendant was observed making furtive movements in the red car and when Ward reached into defendant's pocket, Ward conducted a patdown search of defendant, to which he voluntarily consented. Indeed, after leaving the red car, defendant made no further furtive movements, followed Ward's instructions, and his hands were visible during the entire encounter.

Further, after feeling the hard object in defendant's pocket, Ward did not describe the object's dimensions or shape, nor did he explain what other particular circumstances supported a suspicion that the object was a weapon. Instead, he testified as follows:

"Prosecutor:  When you felt the hard item in the pocket, could you tell what it was prior to removing it?

"Ward:  No. It was just a hard object.

"Prosecutor: Did that, the fact that it was a hard object, give you safety concerns?

"Ward: I didn't know what it was, and it could have been a weapon."

However, something more—some more particularized explanation—is required to justify the more invasive intrusion into defendant's pocket. For the same reason we reject the state's suggestion in its brief that the hardness of the object alone justified Ward's removing it from defendant's pocket on officer safety grounds. Specifically, the state argued that "any hard object is potentially dangerous in a physical confrontation." That suggestion ignores the requirement that the officer have a "reasonable suspicion, based on specific and articulable facts, that *the person poses a serious threat of harm* and that a further search would lessen or eliminate that threat." *Davenport*, 272 Or App at 731 (emphasis added).

In the same way, the surrounding circumstances of the stop also do not provide support for the state's contention that defendant presented an immediate threat of harm. There were three officers on scene at the time of Ward's search. Two of the other occupants of the red car had been detained or arrested and the third had been patted down and allowed to leave. There was no testimony that any weapons were found on any of the occupants of the red car. Further, although defendant's family was known to Ward to be associated with methamphetamine, Ward had no knowledge of defendant's particular drug history—or any history of violence—and no officer described him as displaying signs of being under the influence of intoxicants at the stop. Ward's general observations about drug users, and more specifically about methamphetamine users, did not provide a particularized reason to believe that *defendant* presented an officer-safety risk. *See State v. Morfin-Estrada*, 251 Or App 158, 169, 283 P3d 378 (2012) (noting that "general information that gang members carry weapons is insufficient to give rise to a reasonable suspicion that a particular gang member is carrying a weapon").

Thus, we disagree with the trial court that Ward's suspicion of a threat to his safety was objectively reasonable under the totality of the circumstances known to him at that time of his entry into defendant's pocket. Therefore, we conclude that the intrusion into defendant's pocket was not justified on officer-safety grounds.

## IV. CONCLUSION

There is evidence in the record to support the trial court's finding that defendant consented to a patdown. The evidence does not support a finding that the consent extended to an intrusion into defendant's pockets. Moreover, the trial court erred in concluding that the intrusion into defendant's pocket was justified by officer safety concerns. Accordingly, the warrantless search of the interior of defendant's pocket violated his rights under Article I, section 9, of the Oregon Constitution.[2] As a result, the trial court erred when it denied defendant's motion to suppress evidence found as a result of the interior search of his pocket.[3] We conclude that the evidence that should have been suppressed was essential to defendant's convictions, and the error in denying the suppression motion was, therefore, not harmless.

Reversed and remanded.

---

[2] Because this appeal is resolved under Article I, section 9, we have no cause to reach defendant's additional arguments that the officers' conduct also violated the Fourth Amendment to the United States Constitution.

[3] For the first time on appeal, the state argues that the officers had probable cause to arrest defendant for possession of a controlled substance and conduct a full search of his person incident to arrest. The state acknowledges that the officers testified only to having reasonable suspicion and, significantly, that the trial court did not base its ruling on a probable cause analysis. Thus, the state is effectively asking us to affirm the trial court on an alternative basis under the "right for the wrong reason" principle, which we can do only if we conclude that the record before us is materially the same as the one that would have developed had the state raised the alternative basis for affirmance below. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). Because we believe the record would have developed differently had the state timely raised their probable cause argument, we decline the state's invitation to consider probable cause for the first time on appeal. *State v. Mullens*, 276 Or App 217, 219, 366 P3d 798 (2016) ("[A]s we have previously held, * * * we will not consider * * * an alternative basis for affirmance where that argument was not made below and the record may have developed differently had it been raised."); *State v. Walker*, 234 Or App 596, 607, 229 P3d 606 (2010), *aff'd on other grounds*, 350 Or 540, 258 P3d 1228 (2011).