Argued and submitted March 9, reversed and remanded July 26, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CASE DAVID SIGFRIDSON,
*Defendant-Appellant.*

Douglas County Circuit Court
14CR1900FE; A160192

401 P3d 1269

Erin J. Snyder Severe, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and Garrett, Judge, and Duncan, Judge pro tempore.

## DUNCAN, J. pro tempore

Defendant appeals a judgment of conviction on one count of possession of heroin, ORS 475.854, arguing that the trial court erred in denying his motion to suppress physical evidence—a syringe, a "cooker," and a small plastic baggie and its contents—that was discovered by a sheriff's deputy while taking defendant into custody on a probation violation. The trial court ruled that the items were discovered as the result of questioning that violated defendant's *Miranda* rights, but it concluded that the evidence inevitably would have been discovered as part of a search incident to arrest. For the reasons that follow, we agree with defendant that the state failed to develop a sufficient record to support the trial court's ruling on inevitable discovery, and we therefore reverse and remand.

We review a trial court's denial of a defendant's motion to suppress for errors of law, and we are bound by the trial court's findings of fact, provided that they are supported by constitutionally sufficient evidence. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). In this case, the relevant chronology of events is mostly undisputed.[1] In December 2013, Douglas County Sheriff's Deputy Dorland responded to a 9-1-1 call about a possible heroin overdose. When Dorland arrived, defendant, who was the subject of the call, was standing and talking with an ambulance crew. Defendant appeared to Dorland to be intoxicated from alcohol; he displayed red, watery eyes and slurred speech, and he was swaying while talking to Dorland.

Defendant told Dorland that he was not having a medical issue but had just had too much to drink. Thereafter, Dorland contacted police dispatch and asked them to run defendant's name for "wants and warrants." Dorland learned from dispatch that defendant was "on probation with a no alcohol clause" and that defendant's probation officer wanted him to be detained. At that point, Dorland intended to arrest defendant based on the probation violation.

---

[1] To the extent that the parties offer slightly different versions of the trial court's factual findings regarding this chronology, or there is a lack of clarity in the record, we note those issues later in this opinion. *See* 287 Or App at 77 n 2.

Dorland asked defendant whether he had "anything illegal" on him, and defendant responded that he did not. Dorland followed up by asking whether he could search him to make sure, and defendant refused to consent. Defendant's family members, who were gathered at the scene, began urging defendant to allow a search.

Eventually, defendant admitted that he possessed drug paraphernalia.[2] Dorland took defendant into custody and asked him where the illegal paraphernalia was located, and whether there were any needles that would poke him. Defendant then disclosed that there was a "capped needle in his front left sweatshirt pocket," and that "he had a cooker in his pants pocket and some cleaning swabs."[3]

Dorland searched defendant and located those items in the places that defendant had identified: There was a capped but used syringe in the left pocket of his sweatshirt, the bottom of a Pepsi can with a dark residue in his right pants pocket, and a plastic baggie filled with unused cotton swabs. The Pepsi can and a small piece of plastic in the baggie later tested positive for heroin, and the syringe was apparently destroyed but not tested.

After locating those items, Dorland asked defendant how long it had been since he used heroin, and defendant

---

[2] It is not clear from the record whether defendant stated that he possessed drug paraphernalia as a direct response to a question from Dorland or in response to his family's subsequent urging. Rather than set out the conflicting testimony in detail, we note that there is considerable confusion in this record as to when precisely defendant was taken into custody and whether defendant first disclosed that he possessed drug paraphernalia before or after that happened, and there is some question as to how the court resolved those competing factual issues. Defendant argues that, because the trial court ultimately suppressed all of defendant's statements, including his admission that he possessed drug paraphernalia, on the ground that his *Miranda* rights were violated, we must presume that defendant made those incriminating statements *after* he was in custody and *in response to* Dorland's questions. The state points out that it is unclear what statements were actually suppressed; and, moreover, we note that there is some suggestion in this record that the court was operating (at defense counsel's urging) under an erroneous impression that a defendant is in custody for purposes of *Miranda* at the moment that the officer has the *subjective* intent to arrest—an impression that would affect what statements were suppressed and what facts the court implicitly found when suppressing those statements. However, the parties appear to agree that defendant revealed that the "drug paraphernalia" in his possession included a capped needle and "cooker" only *after* he had been unlawfully interrogated.

[3] Dorland explained that a "cooker" refers to a can used for cooking heroin.

admitted that he had used within the hour. Dorland then read defendant his *Miranda* rights and placed him in the back of his patrol car. Dorland subsequently asked defendant how much alcohol he had consumed. Defendant stated that he had not had much but again admitted to recently using heroin.

Defendant was subsequently charged with one count of unlawful possession of heroin, and he filed a motion to suppress "[a]ll the physical evidence and statements obtained after [his] arrest." Defendant argued that Dorland did not have reasonable suspicion to detain him to investigate his alcohol use; he also argued that he had been interrogated by Dorland before being *Mirandized*, and that "statements made in response to this interrogation * * *, as well as any physical evidence which was found as a result of those statements, should be suppressed."

The state, in response, argued that Dorland had reasonable suspicion to stop defendant from the time that he arrived on the scene of the possible overdose, and that, regardless of any *Miranda* violation, the physical evidence would have been discovered as part of a lawful search incident to arrest on the probation violation. The state argued:

"On a probation violation, not a drug charge, at this point in time. He's going to be searched now incident to arrest. That is going to happen. The fact that the officer asked him permission to [search] does not make it so that he is no longer allowed to search him. The, also the fact that the, he asks him is there anything illegal on you doesn't make it an improper search. If the officer had said nothing, the officer indicated that he would have been searched incident to arrest."

The state's argument relied on the following testimony from Dorland, in which he was asked about the sequence of the search in relation to his questioning:

"Q. [PROSECUTOR] Okay. And then you take him in, then you ask again, whether you can search him, or do you simply ask about paraphernalia?

"A. [DORLAND] Well at, at the point, when he's in custody, he's going to get searched before he gets into our car because we're not gonna—

"* * * * *

"Q. What's the reason for that?

"A. *Just officer safety. We've gotta make sure they don't have any, any drugs, weapons, anything like that on them before they enter our patrol car and go to the jail.*

"Q. Okay. And is it, and is it typical to ask before you pat them down whether they have anything sharp?

"A. Yep.

"Q. Okay. And did you do that in this case?

"A. Yes.

"Q. And what was his response?

"A. *He said that he had a capped needle in his pocket and he told me he had a cooker in his pants pocket also.*

"Q. Okay. And did you seize those items?

"A. Yes."

(Emphasis added.)

Based on that testimony (as clarified by Dorland's later acknowledgement on cross-examination that he had not simply asked about needles, but had also asked "where the illegal paraphernalia was at"), the state argued "there's nothing unlawful about this search. It was part [of] a valid search incident to arrest. The small amount of conversation prior to *Miranda* was an officer safety conversation in the sense that he's asking is anything gonna poke me. And yes, he did say additional words, but the answer was essentially that yes, there's some stuff on me including a needle, which is exactly why the officers ask."

In the course of the arguments, the trial court signaled that it agreed with defendant that his *Miranda* rights had been violated by Dorland's questioning, which was "too intrusive," but that "[t]he drugs, however, the physical items were going to be found inevitably as part of the discovery in taking him into custody as a search incident to arrest. The physical items are admissible. The questioning and the answers are inadmissible."

Defendant then asked for an opportunity to further develop his argument regarding inevitable discovery and explained that the arrest was for a probation violation, not drug crimes, so a search incident to arrest would not extend to a search for drugs or drug paraphernalia. *See State v. Mazzola*, 356 Or 804, 811-12, 345 P3d 424, 430 (2015) (explaining that a warrantless search incident to arrest "can be made for any of three purposes: (1) to protect a police officer's safety; (2) to prevent the destruction of evidence; or (3) to discover evidence of the crime of arrest"). He further argued that "it's not clear that inevitably they are going to find evidence of drug use, especially when we're talking about a baggie. We're not talking about only a sharp, we're talking about other items that were found." He noted that Dorland's testimony about his typical practice actually described an *illegal* patdown—*i.e.*, a search not only for weapons but drugs in general, regardless of the reason for the arrest.

At that point, the court clarified its "inevitable discovery" ruling, but it did not directly address defendant's argument that Dorland had described an illegal search protocol as his typical practice. The court explained that Dorland would have found the syringe as part of a search incident to arrest based on officer safety concerns and that the syringe, in turn, would have given the officer probable cause to expand the search to look for drugs and drug paraphernalia:

> "Well, the needle was, the testimony was that the needle was going to be found. It, the officer has reason to, for his own safety, to be concerned about that. Once the needle is found he has reason to go ahead and search, in addition to that, for other items related to that drug and drug paraphernalia. And there's no indication that it would not have been found. He has reason to protect himself from those sharp objects that could be used as a weapon against him and for his own safety, he has reason to search for them. I am denying the Motion to Suppress as to the physical objects and granting the Motion to Suppress as to the statements and *Miranda* should have been given and it wasn't given."

Following the denial of his motion to suppress the physical evidence, defendant was tried on stipulated facts

and convicted on one count of possession of heroin, and he was sentenced to 18 months' probation.

On appeal, defendant advances a single assignment of error, challenging the court's conclusion that the physical evidence—the syringe, cooker, and baggie and its contents—inevitably would have been discovered regardless of the preceding *Miranda* violation. Specifically, defendant argues that the record fails to establish that Dorland would have conducted a *lawful* patdown that would have revealed the syringe, let alone the cooker or baggie found in defendant's pockets, had defendant not disclosed the existence and location of those items in response to unlawful interrogation. We agree with defendant.

When an officer fails to give the requisite *Miranda* warnings, a court must suppress not only the statements that a suspect makes in direct response to unwarned questioning but also evidence that derives from that constitutional violation. *State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010). In this case, the trial court ruled that the physical evidence was the product of a preceding *Miranda* violation, and the state does not challenge that aspect of the court's ruling. Thus, the only issue before us is the trial court's application of the inevitable discovery doctrine, a doctrine that "permits the prosecution to purge the taint of illegally obtained evidence by proving * * * that such evidence inevitably would have been discovered, absent the illegality, by proper and predictable investigatory procedures." *State v. Miller*, 300 Or 203, 226, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986) (emphasis in original); *State v. Musser*, 356 Or 148, 155, 335 P3d 814 (2014) ("[E]vidence should not be excluded on exploitation grounds if it inevitably would have been discovered or if the police discovered the evidence though a source independent of the illegality."). Or, as the state frames it, the question is "whether Deputy Dorland would have discovered defendant's capped syringe and 'cooker' had defendant not admitted to their possession."

To satisfy its burden under the inevitable discovery doctrine, the state was required to show by a preponderance of evidence "(1) that certain proper and predictable investigatory procedures would have been utilized in the instant

case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *Miller*, 300 Or at 226. In other words, it is not enough that the state *might* have discovered the evidence lawfully; rather, the state must prove that it *would* have. *See id.* (explaining that it is not sufficient for the state to simply show that evidence "might or could have been otherwise obtained" (internal quotation marks omitted)); *State v. Taylor*, 250 Or App 90, 95, 279 P3d 254 (2012) (holding that the state had "failed to show that those procedures [to discover the evidence at the jail] would have been 'proper and predictable,' because the Umatilla County Jail inventory policy authorizing those procedures is unconstitutional").

In this case, the state argues that the "proper and predictable" procedure of a search incident to arrest would have led to the discovery of the syringe and cooker. According to the state, "[a] pat-down or limited search for weapons to protect the officer is *always* justified" as part of a search incident to arrest. (Citing *State v. Owens*, 302 Or 196, 200, 729 P2d 524 (1986) (emphasis in state's brief).) And, the state contends, the "record clearly establishes" that "Dorland planned to pat defendant down for weapons prior to placing him in the back of the patrol car and knew that defendant possessed drug paraphernalia." The state then asserts that, because the capped syringe and the bottom of the Pepsi can are "items of distinct shape and size and readily identifiable as drug paraphernalia," and because it is common knowledge that both are sharp and can be used as weapons, the "record sufficiently supports the trial court's ruling that Dorland would have discovered and seized both items of paraphernalia even without asking defendant where they were."

The state's position in this case requires impermissible speculation. Even assuming Dorland would have conducted a lawful patdown for weapons as a search incident to defendant's arrest on the probation violation, there is no evidence in the record that Dorland, in that hypothetical patdown, would have believed that the object in defendant's sweatshirt was a capped needle, or that the "cooker" in his pants was a weapon of some kind, such that he could have reached into defendant's pockets. *Cf. State v. Sopiwnik*, 176

Or App 127, 133, 30 P3d 430 (2001) ("[T]he fact that [the officer] reaches into the pockets of everyone he arrests did not necessarily make his decision to search the interior of *this defendant's* pockets unreasonable. The decisive questions are whether, irrespective of his normal practice, [the officer] believed that defendant posed a threat to officer safety and whether such a belief was reasonable." (Emphasis in original.)). As defendant points out, Dorland reached into defendant's pockets only after defendant told him that those items were there. Dorland did not provide *any* testimony about how a patdown of *this arrestee* would have proceeded without those admissions, such as describing the size and shape of the capped syringe or cooker, the thickness of the defendant's clothing, or what the discovered items might have felt like through the defendant's clothing.[4] *Accord State v. Musalf*, 280 Or App 142, 158-59, 380 P3d 1087 (2016) (holding that, where the officer "did not describe the object's dimensions or shape, nor did he explain what other particular circumstances supported a suspicion that the object was a weapon," the "hardness of the object alone" did not justify removing it from the defendant's pocket on officer safety grounds).

Thus, the trial court could only speculate as to whether Dorland *would have* seized a capped syringe or cooker based on a reasonable belief that those items were weapons. This record supports, at most, a conclusion that Dorland *might* have lawfully discovered the physical evidence during a patdown of defendant. The inevitable discovery doctrine requires more than that.

Reversed and remanded.

---

[4] The syringe, as noted previously, was apparently destroyed, and the witnesses did not describe it at the suppression hearing. The state asserts that a capped syringe and cooker are of "distinct shape and size and readily identifiable as drug paraphernalia," but we will not make that kind of assumption on matters that are the state's burden to prove.

We also note that the state does not defend the trial court's reasoning that the discovery of the syringe would have given Dorland probable cause to expand the search for evidence of drug crimes, such as the cooker. Rather, the state argues that the cooker itself would have been inevitably discovered as part of a patdown for weapons. Thus, under the state's argument, even if we were to assume that Dorland would have identified a capped syringe as a possible weapon, we would be required to take an even greater leap to presume that the "cooker," which contained drug residue, would have been identifiable as a possible officer safety concern during a patdown.